Good morning, and before we begin the arguments, I would simply like to recognize that we have the privilege and the pleasure of having with us, sitting by designation, our colleague from the District of Massachusetts, the Honorable Richard Stearns, and we'd like to welcome him to the Federal Circuit. All right, we will begin with the first case on the docket, Commonwealth Scientific v. Toshiba, docket number 2008-1108, and for all counsel, when they approach the lectern, for the benefit of the court and those later on listening to the audio recordings, please enter your appearance so we know who you are and who you represent. Mr. Gaffney? Good morning, may it please the court, Paul Gaffney, Williams, and Conley for the appellants. I've reserved five minutes for rebuttal, so I will proceed with that in mind. This appeal arises from a breach of the duty of loyalty by Townsend, Townsend & Crew, Council for Commonwealth Science, the appellee in this case. Townsend had represented Marvell tenuously since 1999 on hundreds of intellectual property matters. In late 2006, while still representing Marvell, Townsend, on behalf of its newer client, brought claims against Marvell's customers, effectively seeking to enjoin one of Marvell's important product lines. You say that created a directly adverse relationship, right? Absolutely. And was that only because of the indemnity agreements or is there some other reason? The direct adverseness between Marvell and Townsend exists regardless of whether indemnity agreements were present. It seems to me to be a stretch. Why would that be so? Judge Dyke, you have to understand the nature of the infringement claim at issue here. CSIRO claims a patent for having solved a problem of wireless data transmission in certain environments. And it does so through a combination of processes that occur inside the chip that is embedded into the products, like the laptops that probably are around the courthouse today. So maybe the better way to say it is to quote Townsend's, CSIRO's lawyer below, that the inventive magic at issue in this dispute is inside the chips. The device makers simply take a chip from Marvell or Intel or someone else and plug it into the box with a power source on it. I understand all that, but absent the indemnity agreement, what's the economic impact on Marvell? The economic impact is that... Loss of customers? Potentially the loss of a business line. That any standards compliant chip could not be distributed inside one of these products. But the patent doesn't cover just the chip, is that right? So the product that Marvell is selling is not the actual patented product? That's Marvell, that's CSIRO's contention of the case. The contention is that the chip is not a transceiver and that it doesn't have a power device and antenna. Is that incorrect? I think that probably is correct. I think there's an issue out there on that, but it's not disputed here. So Marvell's product isn't a direct infringement? We have not been sued for direct infringement. We have now been sued for indirect infringement. And the work Townsend and Townsend was doing for Marvell was, for the most part, or at least in the beginning, trademark work? Well, they trademarked the chips at issue and they did other trademark work. And then later they did patent work on Marvell's 80211 product line. There's no conflict in that representation, is there? Well, we would disagree, and let me explain why in a second. But the first point is that the relationship between Townsend's work for Marvell and the case at issue is irrelevant to the analysis under Rule 1.7. The concurrent client analysis, it doesn't matter that the matters are or are not substantially related. You cannot take a matter adverse to a current client. Putting that aside for a minute, Judge Davis says it's undisputed that in 2005 Marvell knew what Townsend was doing with respect to the Microsoft action. Is that disputed? It is not disputed that Townsend was aware in 2005 that Microsoft and Intel brought separate actions against him. Again, not disputed that despite that knowledge, nonetheless, Townsend was engaged to do patent work for Marvell. Well, that's right. Also undisputed is that Townsend was soliciting that work and they're soliciting it from the former Townsend lawyers who are not involved in this litigation. I mean, I think that that issue cuts both, really cuts both ways. But at the end of the day, it's the lawyer's obligation to police the conflicts. Well, but that's my problem. Let's assume for the moment that the conflict only arises from the indemnity agreements and not from the potential loss of customers, which your argument about the loss of the line of business because the customers wouldn't buy anymore seems to me to be a weak argument for direct adversities. But let's assume that direct adversities is limited to the indemnity agreements. How is the law firm supposed to know that there's a conflict here when the indemnity agreements are not public and Marvell hasn't told Townsend about the indemnity agreement? Here's the answer to that question, Judge Dyke. In 2005, when the Microsoft and Intel cases were filed, CSIRO sought to have the Intel case, the chipmaker case, dismissed. They didn't want to be in litigation with the chipmakers. And in the course of that motion to dismiss, a key issue was the fact that Intel had received an indemnity demand from Dell, the other party in that case. Intel said, I'm a chipmaker. Given the nature of your claims that focus on the inventive magic inside the chip, I've got an indemnity demand from my customer. What does that have to do with whether Townsend should have been aware of Marvell's indemnity agreements? Well, Townsend was aware that Intel was subject to the same sort of indemnity demand. These indemnity agreements didn't exist from the beginning of the relationship between Marvell and its customers, right? Certainly, one of them didn't and I'm not certain that's true as to the indemnity agreement in 2005. There are two indemnity agreements here, right? One in 2005 and one in 2006, right? That's right. And there is no evidence that Townsend had any knowledge of those indemnity agreements, right? That's right. But how are they supposed to know that they suddenly were in a conflict situation when the indemnity agreements are secret? That's the problem. And just on that point, doesn't Judge Davis say that there's evidence that it was affirmatively concealed from Townsend? Yeah, I'm not sure where that comes from. I mean, the existence of the terms of the contract between Marvell and its customers were not disclosed. Disclosure of that would certainly not be customary. They probably don't have an obligation. Marvell may not have an obligation to disclose the indemnity agreements, but Townsend is in a difficult position. How are they supposed to know that they're in a conflict situation where it's based on something that was kept secret by Marvell? Because in the Intel case, they were certainly aware that it's hardly surprising. It can hardly be surprising to them in this case that Marvell is being subjected to the same sort of indemnity claim that was disclosed to them in the Intel case. How can it come as a surprise to them in 2007 that Marvell is in the same situation as Intel? And when you look at the nature of the claim... That seems to me to be a very weak inference. What do the ethical rules say about what to do in a conflict situation where the law firm doesn't know that it's in a conflict situation? Is there any duty of inquiry? What do the ethical rules say about that? I think the ethical rules are silent on that issue. Well, great. What are we supposed to do about that? Here's what the ethical rules are clear on. You have an obligation to police conflicts. That obligation falls on the lawyers. Here they have pursued a theory of infringement that focuses on what is going on inside these chips. The people who use the chips, the customers they sue, are certainly a more attractive infringement target because their products sell for an order of magnitude more than the chip. That's why they're being pursued. But there's no question that when you bring this case in at a law firm and you understand the nature of the theory that the list of potentially adverse parties is broader than the people you might want to sue. And Townsend knew they were representing Marvell. I mean, if they popped open the devices they were suing over, they'd see a chip that they trademarked. Well, let's assume that they didn't know, which I think you agree, and also that there was no reason that Townsend should have known. They didn't know about the indemnity. They didn't know about the indemnity. And let's assume, hypothetically, that there's no reason they should have known about the indemnity. Are we in a thrust-upon situation where once this is discovered they can drop the client? Not in any thrust-upon situation that has been in the case law as comparable to this one. So there's no authority one way or the other. Well, I think the thrust-upon exception to the concurrent client conflict issue is a narrow one, has been narrowly construed, and it's largely been limited to situations where corporations merge and suddenly you find yourself due to a merger. Well, why isn't this similar to that, where unexpectedly, let's assume, that the client has entered into an indemnity agreement, which creates a conflict situation. Why isn't that sort of similar to an unanticipated merger? Again, the answer to that is twofold. One, that the indemnity should have been anticipated. I realize I'm not making very much headway with you, Your Honour, on that one. But the other one is that the indemnity is not the source, given the nature of the infringement claim, the indemnity is not the source of the direct adverseness. I want to get back, just very briefly, I realize you're into your rebuttal on the point that Judge Stern has brought up. In connection with this thrust-upon notion, isn't it relevant to the discourse, the fact that Marvell did know that Cisco was involved and that Townsend was representing Cisco throughout the period of time when there was at least trademark work being given to Townsend. And then, with that knowledge, then patent work started to be given to them. And then that patent work moved into some wireless LAN activity, although we have no idea whether that relates in any way, shape or form to the patent or the issues involved in this lawsuit. Doesn't it sound like, at least Marvell, which knew whether there was an indemnity or not, was in a position to assess whether there was a problem. And they didn't seem to think there was a problem and continued until years later this issue was brought up. Well, I think the answer to that is that you have a situation, sort of a parallel track situation, where you have the patent prosecution folks who are being solicited by Townsend to give them more work in this area. And the question is, should Marvell be blamed for giving them more work or should Townsend be blamed for failing to police its own conflicts and realize that it's suing, it's seeking injunctions against those who put this device in there. It's not an answer that's answered in the case law, but for the point that it is the obligation falls on the lawyer to look at these issues. But how's the lawyer supposed to deal with it is the problem that I'm having. I mean, the only person who knows about the conflict, the only entity who knows about the conflict, is Marvell. And I think what Judge Lynn is asking is, well, why not put the burden on Marvell to say, okay, there's a conflict here and the work has got to stop? Well, the answer to that is that that would be unusual to turn to the lawyer and put the burden on him to identify this sort of conflict. Where it's plain on its face that the chip makers are at the very core of this litigation strategy. I see I'm down to a minute and a half. Well, I'll restore your five minutes of rebuttal and lay it from the other side and just even the playing field will increase your time from 15 to 18 minutes. Thank you, Your Honor.  My name is James Wagstaff, and I am here on behalf of the appellee CSIRO. This case, of course, arises from a tactical motion that everyone agrees would disrupt the litigation and would not lead to- Well, then that's not helpful. I understand, Your Honor. My opening line, let me say this, Your Honor. We go right to the question, I think, raised by Your Honor's questions, which is, in this particular case, what was the evidence that Marvell knew of the information that it now claims gave rise to the conflict? Information that the record is clear that law firm did not know. That is, the existence of the indemnity agreement. Marvell knew about it, yet they continued to send the cases to the Townsend firm. That they now contend- What do you think Marvell should have done? Terminated the relationship? No. Marvell had a choice. It could advise- First of all, if it really thought that there was overlapping work being done, then it wouldn't have given it to them. That's number one. If it thought there was a conflict situation, it could have disclosed the indemnity agreement. It could have chosen to do that. Disclose the indemnity agreement, told them about it, and then the law firm could have made an intelligent decision in its conflict analysis, as the law firm did when they did learn of the indemnity agreement in 2007. They learned of it. They analyzed it. They said, we don't know if this creates a direct adversity, but let's raise it. The red flag went up. They addressed it. There was no red flag flying. If they choose not to tell the law firm, then, Your Honor, they cannot come here under the thrust upon exception and say, well, it was their obligation to discover. In the conflicts analysis, we all do it as lawyers. You're not required to be so prescient as to imagine things that are not otherwise imaginable. We have a finding here in the district court, which this court looks at under an abuse of discretion standard, which is that it was not foreseeable that this kind of indemnity agreement would exist. That's the district court who has a factual finding. That's important, because if it's not foreseeable, and Marvell's the only one who knows it, if they choose not to disclose the very fact that they later say gives rise to a conflict, it's either one of two things. Either there's an indication that perhaps they are creating a conflict, as the judge suggested, and saving it, if you will, lying in wait, but one need not go that far. Under the thrust upon exception, the law… There's no evidence that they were doing this in bad faith, right? Well, Your Honor, you have to read the district court's opinion, of course. I've read it. Yeah, I agree. What's the evidence? What's the evidence? In 2004, they entered into a joint defense agreement. In that joint defense agreement, they're aware of the litigation. They're aware of the issues. They have an indemnity agreement in 2005, and they continue to send work to Townsend. Now, we don't need to go there, Your Honor. We don't need to get that far. It's the only evidence of bad faith? Well, the evidence of bad faith is if you sit on your rights and then raise it later, when you knew it all along, and you continue to give work to a firm that you are later going to argue is directly related, and we can talk about the evidence on that. But they're now here arguing that, may I say it, any fool should have known this. Any law firm should have figured it out. And therefore, they shouldn't have done this extra work. There's no reason to believe, given Marvell's sophistication and the court's finding below, that Marvell carefully policed conflicts with this firm. That's a finding below, that this was not a client who was unsophisticated or unaware of conflicts. It carefully policed conflicts with this law firm. So if they carefully policed conflicts, and they are now here saying that the indemnity agreement gives rise to an obvious conflict because of overlap, that is at least an indication that perhaps this was not being done in good faith. But, Your Honor— But the problem is who has the burden here? Of course. Is it the burden of Marvell, or is it the burden of the Townsend firm? I mean, in general, the burden is on the lawyer. You bet. But the burden is not on the lawyer. For me to imagine—I've never been in your chambers. I have no idea what it looks like. I have no idea whether you have a picture of your family on your desk. I have no idea what you have there. I can imagine that, but a law firm has a duty of reasonable inquiry, but does not have a duty to try and find facts that don't exist. And as the district court found, and this court is bound by an abuse of discretion standard on that finding, it was not even the kind of indemnity agreement you would expect in this situation, that the manufacturer of the $1 chip is going to indemnify the large manufacturer of the computer. That's what the court found. It makes sense. It's not a reasonably— But the general rule is that the lawyer takes the client the way the client is. Absolutely, Your Honor. Absolutely, Your Honor, which is why the thrust upon exception makes so much sense in this case and elsewhere. Putting it sideways— What's the authority that the thrust upon exception would apply? Well, from the ABA code— Please don't talk over me. Excuse me, Your Honor. Don't talk over me. Excuse me. What's the authority for applying the thrust upon exception in these circumstances? ABA model rule 1.7, comment 5. We know that the Fifth Circuit does look to the ABA code. We cited the Board of Regents of the University of Nebraska versus BASF in the client case. But I think the ABA code gets us started because of the logic of this thrust upon exception. If you're representing a client and a development occurs that is unforeseeable, that reasonable lawyers would not have discovered in their conflicts analysis in that situation, then it makes sense that we do not punish the lawyer for not having discovered something they reasonably shouldn't have punished. And we otherwise imagine the result. The result, of course, is there could be either deliberately hidden traps or accidental traps in which clients, like my client here— But the problem is, you know, in reading the briefs here, you're citing district court cases, occasional district court cases. You're citing the ABA model rules. There's really a paucity of authority in this area. And the ABA rules and the opinions, as I understand it, really don't discuss the issues that we've been troubled by this morning. They really don't provide as much guidance about it. Is that fair? I think that's fair, Your Honor. I think, atmospherically, they provide guidance, which is the concept of if a fact develops that was unforeseeable and the law firm acts quickly to withdraw from that litigation, then it would be appropriate to not punish the client in that situation. But, Your Honor, we have more here, which is we have, of course, the waiver argument, which is more established, as Your Honor knows. Can I ask on that? Yes. This is a question that I also have to put to other counsel. When Judge Davis invokes the doctrine of waiver, is he referring to, in his mind, the conduct of Marvell after March when the firm severs the relationship, or at least offers to sever the relationship with Marvell? Or is he talking about the aggregate conduct? I think the opinion tells us he's talking about the aggregate conduct, starting as he asks questions or an argument at length about the joint defense agreement in April of 2004 that they were aware of. They clearly, no dispute, they knew that Townsend was the lawyer for CSIRO as early as 2005. No question about that. And there's no reason to believe, and the judge's opinion, I think, supports this, that when they join the joint defense group with CSIRO represented by Townsend having done licensing efforts before that, they're aware that CSIRO is represented by Townsend. No great mystery here, because when they seek, they make an inquiry about license agreements in June of 2005, they call Townsend. They know Townsend's the lawyer. There's no dispute there. They know Townsend's the lawyer. They know Townsend's involved in the Buffalo suit as well as the Microsoft and Intel suits. They have a joint defense agreement, so they're monitoring it. They choose not to bring their own action in. They choose not to disclose the indemnity agreement. They choose not to do anything at all. But what they do do, as Judge Davis found, is continue to provide patent work and other work to the Townsend firm. We have at least a three-year period in which, by their own assessment here, they are, in fact, by what they say here, if you accept it, there was a direct overlap. A three-year period measured from what, the joint defense agreement? I think you can start as early as the joint defense agreement, Your Honor, because the joint defense agreement is with these very entities, and the joint defense agreement was arising in connection with the licensing efforts and the anticipated threat and lawsuit from my client. Therefore, they were aware of CSIRO making the claims. Were the customers that are involved here being sued by Commonwealth, were they participants in that joint defense agreement? They were, Your Honor, but remember, they were at a slight disadvantage, which is another problem with this record, of course, which is the record provided. Customers were not identified below. They did it by customer A, B, and C. The law in the circuit is very clear, of course, that if you're going to argue a conflict, the moving party has to delineate the specificity of the subject matter as issues and causes. In this case, we have only generalities. It's very difficult to determine. My kids take geometry, and they learn about Venn diagrams, how much overlap there is, and the record below doesn't tell us that. Judge Davis told us, who is very familiar with this litigation, that it was an insufficient record for them to meet their burden of proof. But yes, Your Honor, in this particular case, starting in 2004, and certainly by early 2005, they're aware of Townsend. They're aware of CSIRO's claims. They're aware of the unidentified customers that they are indemnifying are now initiating a lawsuit. There's a forbearance agreement that's signed in May of 2005. So what's the authority that circumstances like that create a waiver? There's a side of my brief, Your Honor. You're supposed to know that. I know that, Your Honor, and I don't have the notes right here. I can give you those case citations. I know Your Honor has read the brief, as you told me. Let me simply say that the Fifth Circuit, there's no dispute here that the waiver is the argument. I can give you the case citations, Your Honor. There's no dispute here that waiver is a grounds for a conflict not being found to arise to the level of disqualification. I don't think they're going to get a dispute that waiver can be done in this case. In this case, if you do not raise a conflict in a timely fashion and you allow enormous prejudice to occur, that is for a client like mine to invest hundreds of thousands of man hours and women hours, as well as other grounds of prejudice in this case. I want to get back to the point that Judge Dyke raised earlier, and that's something that continues to trouble me. And that is that you've emphasized over and over again that Marvell knew this. Marvell knew that. They knew about this agreement. They knew about Cisco's representation. But Cisco also knew about Marvell. Well, when Cisco obviously knew that Marvell was a chip manufacturer and supplier, and that Marvell was a player in this whole scenario. So again, what suggests that the burden to evaluate this is on Marvell or Cisco or Townsend? That's an excellent question. Let me see if I can answer it. Why was it not entirely foreseeable to the Townsend firm when it was putting together this entire litigation strategy? They knew all of the players. They had made a strategic decision to go after the end users, and that's fine. But they certainly knew, had to know, who the suppliers of the chips were, and that perhaps they would be involved in some form or another. Wouldn't that trigger at least some duty to inquire as to whether maybe there's an indemnity? Maybe there's some overlap. Maybe we need to be a little bit careful and concerned. After all, the last thing a lawyer wants is to have his entire client relationship upset at the 11th hour. I agree, Your Honor. And let me see if I can answer that question, which is that mere economic possibilities between clients, if that's the standard, then we can't represent all sorts of businesses. I've represented newspapers my whole career, and they write about others of my clients. There's a possibility of a defamation suit. They might have interaction with other newspapers. And can I not represent two newspapers? Because somewhere down the line, they might have a contractual dispute. We represent clients who might have contracts with each other that we don't know about. So it becomes a question. If it's mere economic potential relations, we're going to throw the conflict rooms into chaos of asking questions. So the question becomes one of reasonable foreseeability, a factual question, in which we have a factual finding by the district court that it was not reasonably foreseeable to believe that the indemnity agreement, which is our real point of contention here, was foreseeable, even with the chip makers being involved, because it was not foreseeable in this industry. And Judge Davis has lived with this case and others like it for a long time. So there's a good reason for deference, which is it was not reasonably foreseeable that chip makers would provide indemnity to the manufacturers. Well, let's assume that's true. It strikes me that what Judge Lynn is suggesting to you is that even without a knowledge of the indemnity agreement, that there's a knowledge here that there's a close relationship. There's a knowledge that the chip is a significant part of the device here and contributes to the infringement. Why under those circumstances shouldn't the patent holder be concerned that its lawyers may be getting into a conflict situation? I mean, it seems to me everybody should have known there was a problem here. And the question is, who's going to bear the burden of not having fixed it earlier? I understand, Your Honor. Excuse me, I didn't mean to interrupt. Your Honor, in this case, the question is, if it's an economic relationship possibility, have we put the indemnity agreement to one side? Because that's not foreseeable and we can talk about the indemnity agreement. Mere economic potential here. That two concurrent clients might have economic relations in the future that are adverse. That's why it's a direct adversity requirement. Normally when you do conflicts, of course, is you run your clients and you see they're on opposite sides. So we're now talking about where that doesn't work because the client wouldn't show up in that context, right? Because Marvell was not a party and chose not to be a party. So then the question becomes, is the fact that these clients might have economic interactions, even adverse economic reactions, always create a direct adversity. And the slippery slope of that is, of course, it's not just here, it's in any case. So the question is, is there a direct adversity? That is, are they directly adverse for the normal circumstance, which has an enormous consequence. Because it's a per se disqualification, absent waiver. It's an enormous consequence. And therefore, when they don't show up on your two columns of clients, what is your duty of inquiry to imagine economic adversity at some time in the future? That's the question. I think it's a very good question. But to answer it, you have to posit a rule. What is the quantum of knowledge that triggers the duty to inquire on the part of the lawyer? Yes, Your Honor. Putting aside waiver, it seems to me that you would have to have a foreseeable direct adversity between your two clients when they're not opposite sides of litigation. A direct adversity. It's foreseeable that they will be directly adverse. And that direct adversity, I think, has to be a situation where it's not the possibility of economic negative effect. You represent one client, my newspaper client. I represent them. They write a bad story about one of my other clients, which might harm them economically. That's not a direct adversity under any authority. Mr. Quirkstaff, you're in the last two minutes of your argument. Would you address briefly the jurisdiction issue? Yes, Your Honor. And before I do that, Your Honor, may I forbid myself by telling Your Honor that the Abney decision and the Cox decision side in our briefs. Those cases seem to be cases in which there was a manipulative feature to the delay. I don't know that that's true in Cox. As opposed to simple delay. I don't think that's true in Cox, Your Honor. Abney, absolutely. Cox. Okay. Your Honor, as to appealability, jurisdiction is my favorite subject, which is, in this case, Your Honor, it has to be a final determination. There's no question that this qualification and the stay generally are not appealable. The only way this case comes before this court on an appealability standard is either by intervention, we can talk about that, or by treating this as a de facto injunction. Let's talk about intervention. The question is, are they an aggrieved party for the intervention? They sought intervention not to intervene in the entire case, but for the limited purpose of having the stay motion and the disqualification alternative addressed by the court. There's nothing wrong with that. Nothing wrong with it at all. And the problem is this, that if they are not allowed to intervene, they have no right to appeal from a final judgment. The only way they can redress their interest is to appeal now. And the cases seem to suggest that under those circumstances, that at least the denial of a motion for leave to intervene, which is what happened here, is appealable, right? Your Honor, no, and may I answer that question? A motion to intervene denial is appealable if you're an aggrieved party by the intervention determination. We have been talking now for almost my 18 minutes about stay and disqualification. The court reached those issues. So if you were to reverse the intervention, I was just thinking about walking over here from across the street. If you were to reverse the intervention, what would you do? Order the district court to consider the stay and disqualification, which it did. So the question becomes, Your Honor, whether there's another exception, which is left without a remedy exception. That is, if they can't appeal, the disqualification ruling will never be reviewed. Three things address that. You raised the subject, I'm here, Your Honor. One is there's a parallel action going forward in which they have raised the disqualification. That can come up to the court in its normal course. Second, they raised this qualification based on the impact on their customers who are well represented and part of the litigation. They didn't join in this motion, and one opposed it. And lastly, Your Honor, and they did, by the way, also raise disqualification in a state court malpractice suit. This is not a case, if you'll forgive my glibness, where we cry for Argentina, like the case Your Honor identified, in which they have no possibility of getting the issue ever resolved. They do, they have, and Your Honor, it's not. What case says that being able to raise the issue in some other context, in some other case, denies your right to appeal from injury in the particular case? Your Honor, the only case they rely on for the opposite proposition says if they are left without a remedy. You have no case? There's no case at all that allows the appeal, Your Honor. They cite one case, Sheet Metal, and it creates an exception. And there's no case that disallows an appeal either, right? Oh yes, disqualification and stay orders are disallowed, and if you're not an aggrieved party on the one grounds in which you can get review, there's no jurisdiction. Intervention, they're not aggrieved. Stay and disqualification, the law is clear. No right to appeal. I thank you, Your Honor, for raising that subject. We have your argument, and we'll hear from Mr. Knapp. Thank you. There were two conflicts at issue here, and we've only addressed one of them. The other conflict arises from the rather remarkable episode after the issue was raised. After this dispute arose, Townsend hired three lawyers from McGuire Woods, including one lawyer. Yeah, but under the ABA committee opinion, this guy was a temporary lawyer, and he's not treated as part of the firm under that opinion, is he? The answer to that is yes. I mean, the ethical commentary is uniform. He wasn't employed by the firm. The case law is pretty clear that the distinction, the issue of imputed conflicts does not turn on what title you give him. He was a lawyer. Well, it doesn't turn on the title, but it turns on the reality of the relationship. This is under this December 16, 1988 ABA opinion. I mean, it would seem under that opinion as though this guy was walled off. He didn't work on other matters. He worked at home. He didn't have access to the files. The walling off issue. Almost as though the relationship was designed with this opinion in mind. Well, look, the ethical commentary we cited uniformly says don't hire people with these sorts of conflicts. Don't hire them. They're lawyers. He's a lawyer. He's practicing law. He's getting work through the firm. Screening is not permitted. Lots of people think screening should be permitted. The model rules. In Panduit, we said it was. Pardon me? Panduit, we said it was. Under California law at the time, this is the model rules. 7th Circuit. 7th Circuit. The model rules say there's no screening. Texas, the model rules jurisdiction, says no screening. California says no screening. So the screening point was just wrong. You can't be screened. So the issue turns on are the conflicts of a contract lawyer, temporary lawyer, the ones we all, the law firms around town hire now, are they imputed to the law firm? And the answer to that question, at least according to the ethical commentary in the case law, is yes. If you win on that, you're going to be very unpopular with your colleagues in the profession. Here's the point, Your Honor. We raised an objection. Please don't hire this guy. He had access to our secrets about this dispute, and they hired him anyway, which I think dovetails into the point raised during my opponent's argument, which is he acknowledged that there was a duty of reasonable inquiry on the part of Townsend in this. And where's the evidence of any inquiry? You did raise an interesting point about access to secrets. And as I comb through the record, putting aside for the moment the niceties of all of the ethical rules that we're wrestling with, I didn't see any evidence that there was some compromise in parties' positions because confidential information was shared that might have undermined a defense or might have affected the party's interests in any way on the merits. Is that because the parties just never got to that point, or is that because there was no such compromise of positions? Judge Lynn, there are two points in response to that. First, we're in the Fifth Circuit, which clearly says our concern on this issue is not limited to the potential misuse of client confidences. That's the American Airlines case. They are just as concerned about the duty of loyalty, separate apart from misuse of information, that my client is owed by the Townsend firm. I appreciate that, but the answer to my question is there's nothing in the record to suggest that any confidential information was shared or any interests were compromised. Well, sure there is, because this firm represented our client, my clients, on matters relating to the 802.11 product line. They had access to the inventors. They had meetings with the inventors. They received other materials from the inventors. There is a presumption, irrebuttable, that useful confidential information is conveyed. Now, I don't think anyone, any chip maker, wants to be faced with litigation of this sort, attacking the inventive magic of these chips, by lawyers who have had this sort of contact with their team of inventors. It's not the same products, that's true, but at what level of generality... And this contact was the result of what? The result of Marvell's engagement of the Townsend firm? Yes. At a time when Marvell was aware of Townsend's representation of Cicero. That's right. Before the time slips entirely away, Mr. Breitschaft makes, it seems to me, a powerful rhetorical point, and this goes to the whole issue of appealability in the first place. And if what puts this case before this court is the motion to intervene, isn't he right if we send it back, we simply ask the judge to do again what he's already done? Well, the motion, denial of the motion to intervene is appealable. This court has jurisdiction to reach... I recognize that, but he didn't really deny the motion to intervene, did he? He allowed it, it was a motion to intervene for a limited purpose. He limitedly allowed it to be considered for exactly that purpose. We raised an important issue. It was resolved on the merits. We are entitled to an appeal. If not now, when? He said deny, didn't he? He said deny. I mean, you could just imagine if we waited until the case was over and then decide to appeal, they'd say, you were never a party. He denied your motion to intervene. So we're entitled to an appeal on the merits of the issues that he reached, and if not now, when? All right. Thank you very much, Mr. Gaffney. We have your argument. We thank both counsel. The case is submitted.